IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

JEFFREY JACKSON                                                      PETITIONER

VS.                                          CIVIL ACTION NO 3:12cv124-DPJ-FKB

JOHNNIE CROCKETT                                                    RESPONDENT

## REPORT AND RECOMMENDATION

## I.  INTRODUCTION

Jeffrey Jackson was convicted in the Circuit Court of the First Judicial District of Hinds County, Mississippi, of armed robbery and was sentenced to a term of 25 years. The Mississippi Court of Appeals affirmed his conviction and sentence.  *Jackson v. State*, 5 So. 3d 1144  (Miss. Ct. App. 2008).  Jackson filed an application to proceed in the trial court with a motion for post-conviction relief (PCR); that application was denied.  He then filed the present petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Having considered the petition, response, and the state court record, the undersigned recommends that habeas relief be denied.

## II. FACTS

Hal and Mal's is a popular restaurant located in downtown Jackson, Mississippi. On the morning of March 14, 2005, Hal White, the chef and co-owner, arrived at work around 8:00 a.m.  Zeta Pigott, the bookkeeper, was already at her desk in the office near the front door of the restaurant.  Shortly after White arrived, a man came into the restaurant and asked for a job application.  After providing him with one, White turned to

walk into the office, whereupon the man pulled a black .38 revolver on White.  He ordered White to empty the safe, which was located in the office.  Pigott saw this and began to stand up, but the man motioned with his gun for her to sit back down.  Once White had given him all of the cash from the safe, the man ordered both White and Pigott to lie down on the floor while he made his getaway.  White protested that Ms. Pigott, who was 84 years of age, was too old to get on the floor, and the robber allowed her to remain seated. The robber left with approximately $4,000.  When a few minutes had passed, White got up and called the police.

Officer Delars Smith with the Jackson Police Department was the first officer to arrive at the scene, followed by Detective Tommy Nelson.  White provided them a description of the perpetrator.  At trial, White testified that his description was of a black male, approximately 5'8" in height and weighing approximately 180 pounds, clean cut, with a light complexion, wearing a gray coat and gray pants.[1]  Officer Smith filled out a report based upon White's description but also including the phrase "dark skinned."  Smith explained at trial that he had used this phrase based upon his own assumption that the perpetrator was dark skinned and that neither White nor anyone else had described him as such.

Janice Banks and Delores Smith were employees of the Mississippi Department of Archives and History and worked in a building near the restaurant.  On the morning of the

---

[1]Detective Smith's recollection of White's description was similar: A black male, 5'9" or taller, clean cut, wearing a gray sports jacket, gray pullover shirt, and gray pants.  Detective Nelson's recollection of White's description was of a black male, around 5'7" to 5'9" in height, clean cut, well-dressed, and wearing a gray sport coat, gray slacks, and a white button-up shirt.

2

robbery, they observed through a window a man standing outside of their building.  A few minutes later, they saw him running to a dark car and leaving the area.  Banks described him as an African-American male with a medium complexion, wearing a dark blazer and light pants.  Smith described him as an African-American with a light complexion and wearing a dark gray blazer, pants of another color, like navy, and a dress shirt.

Approximately two weeks after the robbery, White saw in the local newspaper a photograph of Jackson, whom he recognized as the robber, and called Detective Nelson, the investigating officer for the robbery.  Nelson obtained a photo of Jackson and created a photo lineup consisting of Jackson's photo and the photos of five other subjects.  When he presented the lineup to White, White immediately identified Jackson as the robber.  The next day, Nelson presented the photo lineup to Pigott, and she too immediately identified Jackson as the perpetrator of the crime.

After obtaining a warrant, Nelson and Detective Ford Hayman went to Jackson's home.  When no one answered the door, the officers left.  A few minutes later, a neighbor with whom they had left their number called and said she had seen someone at the house.  The officers returned and knocked on the door; Jackson answered the door only after the officers threatened to break it down.   Nelson and Hayman arrested Jackson and executed a search of his home.  The search yielded a .357 magnum and several types of ammunition.  No .38 revolver was found.

### III.  GROUNDS ASSERTED AND STANDARD OF REVIEW

Jackson seeks a writ of habeas corpus based upon the following grounds:[2]

1.      The prosecution used its peremptory challenges to strike black jurors in violation of *Batson v. Kentucky*.

2.      The in-court identification of Jackson was derived from suggestive pretrial identification procedures.

3.      The following acts, omissions, and rulings of the trial court constituted abuse of discretion:

> Limiting the defense's cross-examination of Detective Nelson.

> Allowing the prosecutor to pose a hypothetical question and elicit speculative testimony regarding fingerprints.

> Showing favoritism to the prosecution by allowing the prosecutor to elicit hearsay testimony over defense objections.

> Sustaining of a defense objection to leading questions but nevertheless allowing the witness to answer.

> Allowing the prosecutor to misrepresent testimony during closing argument.

> Denying the defense's motion for directed verdict.

> Overruling a defense objection to the prosecutor's reference to himself during closing argument, while sustaining a prosecution objection.

> Failing to consider mitigating factors during sentencing.

4.      The following actions of the prosecutor constituted prosecutorial misconduct:

> Improperly leading Detectives Nelson and Hayman regarding ammunition found in the search.

> Improperly leading Janice Banks.

---

[2]Jackson's grounds have been reworded or combined where appropriate.

Improperly leading Hal White.

Misrepresenting evidence during closing argument.

Improperly referencing himself and attempting to bolster eye witness testimony during closing argument.

Making a false statement during closing concerning the photo array.

Improperly arguing that witnesses all described the suspect as wearing the same clothing.

Improperly implying that defense counsel did not think that Caucasian eye witnesses could differentiate between African-American complexions.

Verbally attacking the character of Jackson and improperly referencing prior bad acts.

5       Evidence of the recovery of a .357 handgun in the search of Jackson's home was improperly admitted.

6.      The testimony of the state's witnesses was inconsistent and not worthy of belief.

7.      The following actions and omissions on the part of defense counsel constituted ineffective assistance:

Conducting an ineffective cross-examination of Janice Banks.

Failing to lodge a timely objection to the photo array and to file a pretrial motion to suppress the pretrial identification of Jackson.

Failing to object to the trial court's denial of proposed jury instruction D-2.

Failing to object to an improper comment by the prosecutor regarding the .357 handgun.

Failing to object to comments made during closing regarding Hal White's standing in the community.

Failing to adequately investigate the facts and circumstances of the

5

case and to present exculpatory evidence.

All of these grounds for relief were adjudicated on the merits by the state court, either in Jackson's direct appeal or in his application for post-conviction relief.  They are therefore subject to the highly deferential standard of review set forth in the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d), which allows habeas relief in this case only if the state court's rejection of Jackson's claims involved "an unreasonable application of . . . clearly established Federal law . . .  as determined by the Supreme Court of the United States" or "an unreasonable determination of the facts" in light of the evidence presented to the state court.  *Id.*  The Supreme Court has repeatedly emphasized that " 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'"  *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams*, 529 U.S. at 411.  Rather, the application must be not only incorrect but also "objectively unreasonable."  *Id.* at 409.

## IV.  ANALYSIS OF GROUNDS FOR RELIEF

### Ground One:  Batson Violation

In ground one of the petition, Jackson argues that the state's use of peremptory strikes on eight African American jurors violated *Batson v. Kentucky*, 476 U.S. 79 (1986),

which prohibits purposeful racial discrimination in jury selection.  A criminal defendant

asserting at trial that the prosecution has violated *Batson* must by the "totality of the

relevant facts" first make a prima facie showing that the prosecution has exercised its

strikes in a racially discriminatory manner.  *Id.* at 93-94, 96-97.   If a prima facie case is

made, the burden of production then shifts to the state to articulate a race-neutral reason

for striking the venire member.  *Id.* at 97.  A reason is deemed to be race neutral unless a

discriminatory intent is inherent in the prosecutor's explanation.  *Hernandez v. New York*,

500 U.S. 352, 360 (1991).  The defendant may offer rebuttal to the reason given by the

state.  The trial judge then makes a determination as to whether the defendant has

sustained his overall burden of proving purposeful discrimination.  *Batson*, 476 U.S. at 98.

A trial court's decision on the absence of purposeful discrimination is a "pure issue of

fact."  *Hernandez*, 500 U.S. at 364.

During the first round of jury selection, the state exercised eight of its peremptory

challenges, all of which were directed at African Americans.[3]  The twelve proposed jurors

tendered to the defense consisted of five African Americans and eight Caucasians.   At

this point, the defense raised an objection to the eight challenges.  Observing that the

defense's showing was "borderline," the court directed the state to give its race-neutral

reasons for the challenges. [7-2] at 106.

The prosecutor justified the striking of Claudia Moncure (S-1) based upon her

educational level, which was twelfth grade.  The prosecutor explained to the judge that the

state intended to select as well-educated a jury as possible.  The judge found that while

---

[3]The first two panels consisted of 23 prospective jurors.  Of these, 15 were
African-American and eight were Caucasian.

this explanation taken alone was questionable, when considered within the context of all of the other challenges, several of which the state justified on the same basis, it provided a race-neutral reason for the strike.

The state's second strike was exercised against Denise Brown.  The prosecutor explained that Ms. Brown had been stricken because she appeared to be inattentive and because she had red-dyed hair.  The trial judge stated that the claim of inattentiveness should have been brought to the court's attention earlier, but he accepted this and the juror's appearance as valid race-neutral reasons for her exclusion.

Florese Wilson was the subject of the state's third peremptory strike.  Ms. Wilson was a teacher at a parochial school, and the prosecutor justified the strike by stating that Ms. Wilson might be more lenient because of her position.  The trial court accepted this as a race-neutral reason, observing that she might feel sympathy for a fairly young defendant.

The state exercised its fourth challenge on Frederick Hughes.  The state's reasons for his exclusion were that he had a twelfth grade education, was unemployed, and admitted to a charge of simple assault.

Jessie Christmas was the subject of the state's fifth peremptory challenge.  The state argued that he had been excluded because the last name suggested an association with a well-known criminal family in the county.  At the judge's request, the bailiff ran a search for the last name of Christmas in the court records.  The search revealed that no one with this last name was currently incarcerated in the county but that 29 persons with the surname of Christmas had been arrested in the county.  The judge observed that the

name is an unusual one, that the number of persons in the court system was substantial, and that there was a legitimate concern that someone with the last name of Christmas would have a close relative who had been involved in the criminal justice system.

According to the prosecutor, his sixth strike, exercised on Melinda Dixon, was made because Ms. Dixon had only a twelfth-grade education and had voted not guilty in a criminal trial.  In response, the defense argued that the state had accepted Jerry Taylor, a white juror, who had also voted not guilty in a criminal proceeding.  The court disagreed, finding that although Taylor had stated that a jury on which he had served returned a verdict of "not guilty," it appeared from the whole of his voir dire examination and from his questionnaire that he was referring to a defense verdict in a civil case, not a criminal verdict.

Michael Williams was the subject of peremptory strike S-7.  The race-neutral reasons offered by the state for this strike were the fact that Williams was unemployed and had only a twelfth-grade education.  The state exercised its eighth challenge on Christopher Graves, giving its reasons as his educational level (GED) and a conviction for cocaine possession.

The court accepted all of the state's reasons as race-neutral and found that Jackson had failed to show purposeful discrimination.[4]

On appeal, Jackson limited his argument to the striking of Moncure, Dixon, Wilson, and Brown.  *Jackson v. State*, 5 So. 3d 1144, 1147 (Miss. Ct. App. 2008).  In considering the strike of Moncure, the appellate court observed with approval that the trial judge had

---

[4]The jury that was ultimately seated consisted of five Caucasians and seven African Americans.

followed the admonition of the Fifth Circuit in *Miller-El v. Dretke*, 545 U.S. 231 (2005), in evaluating the plausibility of the prosecutor's proffered reasons for the strike in light of the manner in which the prosecution had exercised its other strikes. *Jackson*, 5 So. 3d at 1147-48. As to Dixon, the state court noted that one of the proffered reasons for striking her--her educational level--was consistent with the reasons given for Moncure. *Id.* at 1148. It also rejected Jackson's arguments that the striking of Dixon because of her vote to acquit in a criminal case constituted disparate treatment because an unchallenged white venireperson shared this same characteristic. The court of appeals found that Jackson failed to prove disparate treatment because the exchange between the prosecutor and white venireperson was ambiguous on whether she had voted to acquit in a criminal case; in fact, the court of appeals stated that it was "probable," based on the prosecutor's voir dire questions and the white venireperson's response, that the jury on which she had served did not reach a verdict at all. *Id.* As to Wilson, the appellate court held, citing a Mississippi case, that Wilson's employment as a teacher constituted a race-neutral reason for her exclusion. *Id.* at 1148-49. Finally, as to Brown, the court of appeals held that the trial court's acceptance of the state's race-neutral explanation for striking her, specifically that she was inattentive and had red-dyed hair, was not "clearly erroneous or against the overwhelming weight of the evidence." *Id.* at 1149-50. Thus, the state appellate court found nothing to undermine the trial court's finding that the state had not engaged in purposeful discrimination in exercising its peremptory challenges.

Under AEDPA, the role of a federal court considering a *Batson* claim is to determine whether the state court's factual finding was unreasonable in light of the

evidence. § 2254(d)(2); *Miller-El*, 545 U.S. at 240.  In making that determination, the court is to presume the court's findings as to the prosecutor's intent to have been correct, and that presumption can be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254 (e)(1); *Miller-El*, 545 U.S. at 240; *Murphy v. Dretke*, 416 F.3d 427, 432 (5ᵗʰ Cir. 2005). The prosecutor offered plausible race-neutral reasons for each of the strikes, the trial court accepted the reasons given by the state, and Jackson has come forward with no clear and convincing evidence to rebut the presumption that this court must give to the state court's finding of no discriminatory intent.  Habeas relief is not warranted on ground one.

### Ground Two: Impermissibly Suggestive Identification of Jackson

In ground two, Jackson contends that the pretrial identification of him by White and Pigott was the result of an impermissibly suggestive photo array and that therefore their in-trial identification of him should have been excluded.  The testimony at trial indicated that after White saw Jackson's photo in the local newspaper, he contacted Detective Nelson, who prepared a photo line-up consisting of a photo of Jackson and photos of five other subjects.  White and Pigott identified Jackson immediately when shown the line-up. They also positively identified Jackson at trial as the perpetrator of the crime.

In order to obtain habeas relief based upon a pretrial identification by photograph, a petitioner must establish that the identification procedure "was so impermissibly suggestive as to give rise to a substantial likelihood of misidentification."  *Herrera v. Collins*, 904 F.2d 944, 946 (5ᵗʰ Cir. 1990) (citing *Simmons v. United States*, 390 U.S. 377 (1968)).   Most of Jackson's arguments in support of ground two consist of general

complaints of alleged inconsistencies in the witnesses' descriptions of him.  These are more appropriately considered *infra* in connection with ground six.  Jackson also takes issue with the circumstances of White's initial identification of Jackson in the newspaper photo.  According to Jackson, his photo appeared along with the photos of three other males and one female with a caption indicating that all were wanted for robbery by the Ridgeland Police Department.  The record is unclear as to this allegation.  Assuming that it is true, it does nothing to undermine White's initial identification of the robber while reading a newspaper, as there is no indication that he was prompted or encouraged in any way to find a photo of the robber in the newspaper.

The only argument offered by Jackson as to why the photo array presented by Detective Nelson was impermissibly suggestive is Jackson's assertion that the photo in the lineup was the same photo as had appeared in the newspaper.  This is not supported by the evidence, as White testified at trial that the photos were not the same, and there was no evidence to the contrary.  Jackson has offered no other argument as to how the photo lineup was suggestive.[5]

Jackson has not shown that the photo array was impermissibly suggestive or that his in-court identification was tainted.  Thus, there is no basis for this court to conclude that the state court's rejection of ground two was objectively unreasonable.

_____

[5]The actual photo array is not a part of the record before this court.

***Ground Three:  Abuse of Discretion by the Trial Court***

In ground three, Jackson complains of numerous rulings by the trial court, several of which consist of rulings on evidentiary objections.  A state court's evidentiary ruling justifies the granting of habeas relief only if it violates a specific constitutional right or renders the trial fundamentally unfair. *Johnson v. Puckett,* 176 F.3d 809, 820 (5th Cir.1999).  A violation of due process occurs only where the evidentiary ruling can be said to have had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  The inquiry as to whether due process has been violated demands consideration of the significance of the challenged evidence "in the context of the entire trial."  *Gonzales v. Thaler*, 643 F.3d 425, 430-31 (5th Cir. 2011) (citing *Thomas v. Lynaugh*, 812 F.2d 225, 230-31 (5th Cir. 1987)).

Jackson first challenges a ruling during the defense's cross-examination of Detective Nelson.  On direct, Nelson testified that White had described the robber as "clean cut."  On cross examination, defense asked Nelson whether "clean cut" meant "clean shaven."[6]  The state objected, arguing that the question required Detective Nelson to speculate as to White's meaning, and the court sustained the objection.  Clearly, Detective Nelson was in no position to speculate as to what White had meant when he used the phrase "clean cut."  Jackson has not shown that this ruling was erroneous.

Next Jackson complains that the court allowed the prosecutor to pose hypothetical questions to Detective Nelson on redirect.  During cross-examination, Jackson's attorney

---

[6]Defense counsel indicated during his opening statement that Jackson had a mustache at the time of the trial.

questioned Detective Nelson regarding the failure of the police to dust the scene of the robbery for fingerprints.  In response, Nelson explained that the robber had not touched anything in the office.  On redirect, the prosecutor asked Nelson whether a robber who did not touch anything with his fingers would leave any fingerprints.  Defense counsel objected, arguing that it was a hypothetical question and required speculation.  The trial judge overruled the objection.  The question did not require speculation, and Jackson has failed to show why it was improper.

During direct examination of White, the prosecutor asked him who, other than employees and former employees, would have had knowledge as to the location of the safe.  Jackson's attorney objected, arguing that it required White to speculate.  The trial judge overruled the objection.  The prosecutor then rephrased the question, asking who, other than employees, would have been in the restaurant's office.  White responded that a lot of people came into the office, including vendors and delivery persons.  Jackson claims that in overruling this objection, the trial judge showed favoritism towards the state.  However, he has failed to explain what was improper about the testimony or the judge's ruling.

Jackson also complains that the trial judge sustained an objection by the defense but then allowed the witness to answer the question anyway without admonishing the jury.  However, he has not identified where in the record this occurred.

Jackson has failed to establish any erroneous evidentiary ruling, much less any such ruling rendered his trial fundamentally unfair.  These claims are without merit.

Two of Jackson's allegations of abuse of discretion concern the state's closing

14

argument.  During his closing statement, the prosecutor made a reference to Ms. Pigott's having gone to a store to purchase a newspaper.  Defense counsel objected, stating that he did not believe there was any testimony to support this statement.  The trial judge responded that the jury could determine whether it was in evidence or not.  Jackson apparently believes that the trial judge should have responded differently.  He also complains that the trial judge erred in overruling a defense objection to the prosecutor's reference to himself during his closing statement.  Again, it is unclear to what Jackson is referring: Jackson's attorney made only one objection during the state's closing, and that objection was sustained.  Jackson's arguments regarding the state's closing argument do not raise any cognizable habeas issue.

Finally, Jackson contends that the trial court's sentencing of him constituted an abuse of discretion, in that the trial court sentenced him "for the nature of the crime rather than his individual status."  This fails to state a constitutional claim.  Jackson's sentence was within the statutory limit, which is a term calculated to be less than life based upon the defendant's life expectancy, and it clearly was not so disproportionate to the crime as to violate the Eighth Amendment.[7]

---

[7]Miss. Code Ann. § 97-3-79 states that upon conviction, the defendant "shall be imprisoned for life in the state penitentiary if the penalty is so fixed by the jury, and in cases where the jury fails to fix the penalty at imprisonment for life in the state penitentiary the court shall fix the penalty at imprisonment in the state penitentiary for any term not less than three (3) years."  Under Mississippi law, a sentence for a term of years must be calculated to be reasonably less that life.  *Stewart v. State*, 372 So. 2d 257 (Miss. 1979).  The trial judge calculated Jackson's life expectancy as 33 years.

Jackson has also included in ground three an allegation that the trial court abused its discretion in denying his motion for a directed verdict.  This is essentially a claim that the evidence was insufficient to convict him and is analyzed in ground six.

***Ground Four:  Prosecutorial Misconduct***

In ground four, Jackson alleges numerous instances of prosecutorial misconduct. Claims of prosecutorial conduct are subject to a two-step analysis.  *United States v. Ebron*, 683 F.3d 104, 140 (5th Cir. 2012).  At the first step, the court evaluates whether the complained-of remarks by the prosecutor were improper.  *United States v. Fields*, 483 F.3d 313, 358 (5th Cir. 2007).  If so, the court goes on to determine whether the improper remarks resulted in prejudice to the petitioner.  *Id.*  Prejudice occurs where the remarks "cast serious doubt on the correctness of the jury's verdict."  *Ebron*, 683 F.3d at 140.  To make the determination of prejudice, the court considers three factors: "(1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction."  *Id.* (quoting *United States v. Mares,* 403 F.3d 511, 515 (5th Cir. 2005)).

Several of Jackson's allegations of prosecutorial misconduct concern leading questions.  Jackson complains that the state's attorney improperly led Detective Nelson during his questioning of him concerning the ammunition recovered in the search of Jackson's home:

> Q.   Did you find any weapons there?
>
> A.   We found one weapon, a Colt Trooper .357 Magnum that a patrolman found in the bottom of a closet inside a shoe box.
>
> Q.   Did you find any other ammunition along with that weapon?
>
> A.   Yes, sir.  We found several different types of ammunition.
>
> Q.   Nine millimeter?
>
> A.   Nine millimeter.

16

[7-3] at 13-14.  Defense counsel objected to leading, and the court sustained the objection.  *Id.*  The prosecutor continued as follows:

Q.      What types--what types of ammunition did you find?

A.      I found .38 super rounds, .357 magnum rounds nine millimeter--

*Id.*

Jackson complains of similar questioning of Detective Hayman concerning the search:

Q.      Was there anything else found around that weapon?

A.      No, sir.

Q.      Any other ammunition?

A.      There was--

DEFENSE COUNSEL:      Object to the leading, your Honor.

PROSECUTOR:             Okay.

Q.      Was there anything else found around that weapon?

THE COURT:               Sustained.

A.      There were a few rounds of ammunition.

[7-3] at 41.

The trial court found the question suggestion that ammunition was found to be improper, as it sustained the defense's objection.  The prosecutor rephrased the question, Detective Hayman testified that ammunition had been found, and without any further objections from defense counsel, the prosecutor then asked non-leading questions about what types of ammunition had been found. [7-3] at 41-42.

Janice Banks's testimony concerning the suspect's complexion is the focus of Jackson's next allegation of misconduct by the prosecutor.  Ms. Banks testified on direct that the suspect's skin was "like a caramel color." [7-3] at 51.  She also noted that it was lighter than her own skin color. [7-3] at 55.  The prosecutor then asked her, "Okay.  So he's not as dark as you are?" and she responded " No, sir." [7-3] at 55.  Defense counsel objected to leading, and the trial judge sustained the objection.  The prosecutor ended his cross examination at that point.  Jackson argues that the prosecutor's leading question was improper.

Jackson complains also of the prosecutor's use of leading questions during Mr. White's direct testimony.  However, Jackson has not identified the specific questions he is complaining about.  Defense counsel made only one objection for leading during the state's questioning of White. That objection was made after the prosecutor asked White whether he knew certain of his customers by their face.  White answered affirmatively before the objection was lodged; however, the trial judge nevertheless sustained the objection.

   Several of these questions were technically improper.  None, however, rises to the level of prosecutorial misconduct.  It cannot be said that any testimony that was admitted in response to leading questions was so significant or prejudicial as to cast serious doubt on the verdict, especially in light of the strong evidence against Jackson in the form of the eyewitness testimony of White and Ms. Pigott.

Next, Jackson argues that the prosecutor misstated the facts in evidence when questioning Ms. Pigott by implying that the robber had pointed a gun at her.  Ms. Pigott

testified that when she began to stand up from her desk, the robber motioned with his gun for her to sit down.  The prosecutor then asked, "Okay.  Where was the gun prior to that, prior to him pointing it at you?" [7-3] at 69.  Ms. Pigott replied that "[h]e never really--well the only time he pointed it at me was when he motioned for me to sit back down," adding that "[t]he rest of the time it was pointed at Hal."  *Id.*  Given the fact that Ms. Pigott had testified that the robber had gestured to her with the gun, the prosecutor's question was not improper.

Jackson's next complaint of prosecutorial misconduct concerns the prosecutor's mistaken description of the type of gun used by the robber.  White testified that the gun used by the robber was a .38.   The search of Jackson's residence did not yield a .38; however, a .357 was found.  Initially, during his closing argument, the prosecutor made a reference to Mr. White's having had "a .357 handgun pointed in his face." [7-3] at 118.  He later correctly referred to the gun used by the robber as a .38.   [7-3] at 133.  Jackson complains that the prosecutor's reference to a .357 was a deliberate attempt to mislead the jury into believing that the weapon used in the robbery had been recovered at Jackson's house.

The prosecutor's misstatement was unfortunate.  However, there is no indication whatsoever that the prosecutor intended to misstate the facts or to mislead the jury; rather, it appears that he simply made a mistake, and he corrected it later in his argument.  Furthermore, the jury was instructed that arguments were not evidence.  If the evidence against Jackson had been weaker, this misstatement might have taken on greater significance.   But the eyewitness testimony against Jackson was strong.  The state court

19

could reasonably have concluded that the prosecutor's misstatement about the handgun did not cast serious doubt on the correctness of the verdict.

In another attempt to establish prosecutorial misconduct, Jackson contends that the prosecutor tried to inflame the jury during closing arguments by saying that the robber threatened to shoot Mr. White if he did not give him money from the safe. He also claims that during closing, the prosecutor improperly referred to himself in an attempt to bolster eye-witness testimony. This latter allegation appears to be a reference to that portion of the closing argument in which the prosecutor discussed Mr. White's testimony by the use of the rhetorical device of speaking as if he were White:

> I mean, I've been robbed at gunpoint. Somebody is telling me that if you don't do what I tell you to do somebody is going to get hurt. I'm going to remember that guy's face. I mean, I've never been robbed before . You know, this is something that is a memorable experience you're probably going to remember for the rest of your life until the day you die. You're going to be able to tell me who this person is that robbed me.

[7-3] at 121.

Mr. White testified that the robber held a gun to his head and ordered him to open the safe. When White tried to stall, the robber said "you're pissing me off" and bumped White in the head with the pistol. [7-3] at 80. Clearly, Mr. White interpreted the robber's actions as a threat that he would be shot if he did not follow the robber's instructions. There was nothing improper about the prosecutor's remarks or his taking on the voice of Mr. White as a rhetorical device.

Jackson claims that the prosecutor misled the jury during his closing statement by arguing that the photo seen by Mr. White in the newspaper and the photo used in the photo lineup were two different photos. This statement was consistent with Mr. White's

20

testimony and was in no way improper.  *See* [7-3] at 93.

Jackson contends that the prosecutor improperly argued that the witnesses all described the suspect as wearing the same clothing.  While the witnesses did not give identical descriptions of the robber's clothing, their descriptions were generally consistent: Mr. White testified that the robber wore a gray coat and gray pants, [7-3] at 85-86, whereas Detective Nelson's recollection of White's description of the robber was that he was wearing a gray sport coat, gray pants, and a white button-up shirt, [7-3] at 3.   Banks testified that the man she saw outside her office building window was wearing a dark blazer and light pants. [7-3] at 50.  Dolores Smith, Ms. Banks's co-worker, testified that the man she observed was wearing a dark gray blazer, pants of another color, like navy, and a dress shirt. [7-3] at 60.  Ms. Pigott testified that the robber was nicely dressed. [7-3] at 72.  These descriptions were not so different as to call into question the propriety of the prosecutor's characterization of the testimony.

Jackson's next claim in this regard concerns comments as to the color of the suspect's complexion.  During voir dire, defense counsel asked whether any of the prospective jurors had difficulty distinguishing African-American complexions.  During closing, Jackson's attorney emphasized the initial inclusion of the words "dark-skinned" in the police report and the apparent absence of a reference to the robber's complexion in the written statements of Pigott and White.[8]  Subsequently, perhaps in response to one or both of these remarks, the prosecutor stated as follows:

He talks about skin shade of a black man.  And I'm sorry that Mr. Smith doesn't

---

[8]These statements were admitted into evidence but are not a part of the record filed herein.

think that white people can differentiate between--or some white people can't differentiate between black people and can't tell them apart.

Folks, this is not 1956.  This is 2006.  And I am personally offended by that.  Because I think, you know, we've gotten beyond that.  I hope we have.

[7-3] at 133-34.   Defense counsel objected, and the trial judge sustained the objection and instructed the jury to disregard the comments.  While the comments may have been improper, the judge gave an appropriate instruction.  It cannot be said that these statements were so prejudicial as to cast serious doubt on the verdict.

Finally, Jackson takes issue with comments by the prosecutor concerning Jackson's behavior during the execution of the search warrant on his home.  During closing, the prosecutor stated that Jackson would not unlock the door for the police but, instead, hid "behind that door for some reason." [7-3] at 136.  Jackson argues that in making these comments, the prosecutor "verbally attacked" his character and improperly raised prior bad acts.  The prosecutor's statements were not improper.  Rather, they were an accurate summary of the evidence: Detectives Nelson and Hayman both testified that Jackson initially refused to open the door or respond in any way to the officers' knock on the door. [7-3] at 12-13 and 39-41.

Most of the remarks about which Jackson complains were not improper.  And Jackson has failed to establish any impropriety that was so prejudicial that it seriously calls into question the correctness of the guilty verdict.  No relief is warranted under ground four of the petition.

### Ground Five:  Admission of Improper Evidence

Jackson claims that he was denied a fair trial by the admission of evidence that a

22

.357 magnum was recovered in the search of his home.[9]  However, he makes no

argument as to why the admission of this evidence was, in and of itself, erroneous.  The

fact that Jackson possessed a gun was neither significant nor particularly prejudicial, and

Jackson does not make any serious argument to the contrary.  Rather, his argument

focuses on the effect of the admission of evidence of the .357 in conjunction with the

prosecutor's subsequent misstatement that a .357 had been used in the robbery--a matter

that is dealt with *supra*.  In any event, he has not shown that the admission of this

evidence violated any evidentiary rule, much less that it had a "substantial and injurious

effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619,

637 (1993).

### *Ground Six:  Insufficiency of the Evidence*

In Ground six, Jackson argues that the testimony of the state's witnesses was

inconsistent and "not worthy of belief by an [sic] fair minded person."  The undersigned

construes this as a allegation that the evidence was insufficient to support the verdict.

Habeas relief is available for insufficiency of the evidence only "if it is found that upon the

record evidence adduced at trial no rational trier of fact could have found proof of guilt

beyond a reasonable doubt." *West v. Johnson,* 92 F.3d 1385, 1393 (5th Cir.1996)

(quoting  *Jackson v. Virginia*, 443 U.S. 307, 324 (1979)).

Much of Jackson's argument concerns the differences in the witnesses'

descriptions of the suspect's clothing.  As stated *supra*, these differences were not so

---

[9]No objection was made to this testimony. In fact, defense counsel told the
jury during his opening statement that a .357 had been recovered in the search of
Jackson's home.

great as to call the verdict into question.  Jackson argues that Ms. Banks's testimony was

inconsistent, but this argument is based upon mischaracterizations of that testimony.  He

also argues that it is clear that Ms. Pigott's testimony was fabricated, relying on alleged

inconsistencies between her trial testimony and the initial description of the suspect she

gave to Detective Nelson.   At trial, Ms. Pigott identified Jackson as the robber, stating

that she got a very good look at him during the robbery and was so close to him that she

"could have reached out and touched him." [7-3] at 77.  She also described him as nicely

dressed.  Jackson argues that this testimony was inconsistent with Detective Nelson's,

citing the following portion of the defense's cross-examination of Nelson:

> Q.      But when the statements were given, in fact, Ms. Zeta Pigott, she said she
>         couldn't remember anything, as far as she couldn't describe him at all?
>
> A.      The clothes, she just said he had on layered clothes, because she was
>         scared.  She was 84 years old, and she said I had a gun in my face.

[7-3] at 19.  A reasonable interpretation of Nelson's testimony is that Ms. Pigott was too

upset to answer his questions, not that she had been unable to observe the suspect

carefully enough to remember his face.

     The remainder of Jackson's arguments consist of misrepresentations of evidence

and testimony that merit no further discussion.

     Overall, the eyewitness testimony presented against Jackson was strong,

consistent, and convincing.  White testified that he was in a small, well-lighted office with

the robber for approximately 15 minutes, and, as referenced above, Ms. Pigott stated that

she had a good opportunity to look at him.  Both witnesses testified unequivocally that

Jackson had robbed Hal White at gunpoint.  The state court could reasonably have

concluded that a rational juror could have found Jackson guilty beyond a reasonable doubt.  This claim is without merit.

### Ground Seven:  Ineffective Assistance of Counsel

Analysis of ineffective assistance claims begins with the well-known test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).   Under *Strickland*'s two-prong analysis, a petitioner must first show that his attorney's performance was deficient.  *Id.* at 688.  "Deficient" means that counsel's performance was "outside the wide range of professionally competent assistance."  *Id.* at 690.  If a petitioner succeeds in establishing this first prong, he must go on to demonstrate that his attorney's deficient performance prejudiced the defense such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  The standard of review of an attorney's performance is "highly deferential," and a court considering an ineffectiveness claim is to "indulge a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance."  *Id.* at 689.

The difficulty faced by a habeas petitioner in seeking to establish a claim of ineffective assistance is compounded when the claim is viewed through the lens of § 2254(d).  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Harrington v. Richter,* 131 S.Ct. 770, 788 (2011)

Jackson's first allegation of ineffective assistance concerns the testimony of Janice Banks.  Banks testified that on the morning of the robbery, she was sitting with her back to

a window talking with Delores Smith when Ms. Smith made a reference to a man she saw

through the window.  Banks turned around to see who her co-worker was talking about

and saw a black male, around 30-35 years of age, clean-cut, wearing a dark blazer and

light pants.  As to his complexion, Banks testified that it was "caramel color," and "wasn't

dark and . . . wasn't . . . light-light . . . ."  [7-3] at 51.  She testified that later she saw in

the glass a reflection of the man running but that by the time she got up to look, he was

already in his car and backing out.

        Jackson argues that his trial counsel was ineffective for failing to cross-examine

Banks concerning the inconsistencies in her testimony, specifically, that she could not

have seen the suspect because her back was to the window.  Banks's testimony was not

inconsistent on this point.  She stated very clearly that although her back was initially to

the window, she turned around and looked out the window after Ms. Smith drew her

attention to the man outside the window. [7-3] at 49-50.  Thus, defense counsel's

performance cannot be characterized as deficient.

        Jackson's next allegation of ineffective assistance concerns the photo arrays used

to identify Jackson and the testimony regarding them.  He argues that his attorney should

have objected and should have filed a pre-trial motion challenging the "suggestive

identification testimony," but he fails to state any legal basis for an objection or motion.  As

discussed *supra*, there was nothing to indicate that there was anything suggestive about

the photo array or any basis for challenge of the in-court identifications.

        The defense's proposed jury instruction D-2 is the subject of Jackson's next claim

of ineffective assistance.  Jackson argues that his attorney should have objected when

26

the trial judge refused the instruction.   The proposed instruction read as follows:

> The Court instructs the jury the burden of proof of each and every element of the crime in this case charged against Jeffrey Jackson is upon the State of Mississippi, and if you have from the evidence and the circumstances in the case a reasonable doubt that the witness is honestly mistaken for any reason as to the fact that Jeffrey Jackson robbed the said witness, then you must find the Defendant not guilty.

[7-3] at 39.  The record indicates that Jackson's attorney argued for the instruction but that the trial judge nevertheless refused it on the basis that it was confusing and cumulative of the other instructions.   Jackson has shown neither deficient performance nor prejudice on this claim of ineffective assistance.

In his next claim of ineffective assistance, Jackson once again raises the issue of the prosecutor's misstatement during closing argument that White had been robbed with a .357 handgun, arguing that his attorney should have objected.  Again, while the misstatement was unfortunate, the prosecutor corrected it later in his argument.   Jackson has not shown that this misstatement was so prejudicial that the result of the trial would likely have been different had his attorney made an objection.

During the state's final closing argument, the prosecutor made a reference to Hal White's standing in the community:

> Now, what evidence do you look at.  What evidence did we present.  Well, we presented Hal White, a man who has been in this community for 20 years, who has invested in this community and who continues to invest in this community, who has raised money for the Children's Hospital, who provides entertainment for this city on a--everyday, who hires people, who hires people on a regular basis, whose job it is to recognize patrons who come in his restaurant and remember their facial features.  And when they apply for a job he's going to take a personal account of what they look like.
>
> Now, is that guy telling the truth or not.  Okay.  Does he know what he's talking about or not, or is he a liar.  Because this is not a question of mistake.  This is not a

question of mistake here.  Either he's telling the truth or he is a liar.

[7-1] at 132-33.  Jackson argues that his attorney's failure to object to this argument constituted ineffective assistance.

It appears that these remarks were in response to a portion of defense counsel's argument in which he suggested that White had been mistaken in his identification of Jackson.  Jackson has not shown that these remarks were improper or that there was any basis for an objection by his attorney; neither has he shown *Strickland* prejudice.

Jackson next complains that his attorney failed to adequately investigate his case and to present exculpatory evidence.  Specifically, Jackson argues that he informed his attorney that he owned neither a dark-colored vehicle, a gray blazer, nor a black .38 revolver.  Jackson does not indicate what evidence, other than testimony from unidentified witnesses, could have established these alleged facts.  Jackson's attorney argued in closing argument that neither Jackson nor anyone in his family owned a black car, and he elicited testimony from Detective Nelson on cross-examination that neither the black car nor a black .38 revolver was traced to Jackson or his family.  Thus, trial counsel worked with what he had; it is unclear what benefit would have been gained by any further investigation.  Similarly, Jackson argues that his attorney could have presented testimony from his wife's co-workers that at the time of the robbery, he was dropping his wife off at work.  However, Jackson fails to identify these alleged witnesses or even specify his wife's place of employment.  None of these speculative "should haves" rise to the level of a *Strickland* violation.

## V.  CONCLUSION

Jackson has failed to establish that the state court's adjudication of any of his claims was contrary to, or involved an unreasonable application of, clearly established Supreme Court law or was based upon an unreasonable determination of the facts. Accordingly, the undersigned recommends that habeas relief be denied and the petition be dismissed with prejudice.

The parties are hereby notified that failure to file written objections to the proposed findings, conclusions, and recommendation contained within this report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions accepted by the district court.  28 U.S.C. § 636; Fed. R. Civ. P. 72(b); *Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

Respectfully submitted, this the 7th day of January, 2015.

/s/ F. Keith Ball                                 
UNITED STATES MAGISTRATE JUDGE

29